**William CROTHERS, Petitioner,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

No. 93–1131.

United States Court of Appeals, Fourth Circuit.

Argued April 11, 1994.

Decided Aug. 31, 1994.

**ARGUED:** Michael L. Turner, Kelly, Jasons, McGuire & Spinelli, Philadelphia, PA, for petitioner. Glynn L. Mays, Sr. Asst. Gen. Counsel, Commodity Futures Trading Com'n, Washington, DC, for respondent. **ON BRIEF:** Samuel R. Kilgore, Kilgore & Lacey, Newland, NC; Michael H. McGee, Charlotte, NC, for petitioner. Pat G. Nicolette, Acting Gen. Counsel, Jay L. Witkin, Deputy Gen. Counsel, Commodity Futures Trading Com'n, Washington, DC, for respondent.

Before MURNAGHAN, Circuit Judge, SPROUSE, Senior Circuit Judge, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.

Petition denied by published opinion. Senior Judge SPROUSE wrote the opinion, in which Judge MURNAGHAN and Senior Judge ALEXANDER HARVEY, II joined.

## OPINION

SPROUSE, Senior Circuit Judge:

We review a Commodity Futures Trading Commission ("Commission") order imposing a $25,000 fine on William R. Crothers and revoking his registration as an "associated person."[1] Crothers was an account executive for Interstate Securities Corporation and executed futures transactions for Surety Federal Savings & Loan Association, one of Interstate's customers. In 1987, the Commission's Division of Enforcement initiated this civil proceeding against Interstate, Crothers, and Robert W. Bigham, another account executive at Interstate, contending that they had violated the Commodity Exchange Act, 7 U.S.C. §§ 6b(a), 6d(2). It was alleged, and an ALJ subsequently found, that Crothers and the other respondents had executed unauthorized trades in a futures trading account, misused Surety Federal funds, and fraudulently failed to disclose material facts to Surety Federal. The Commission also alleged, and the ALJ agreed, that Crothers and Interstate had violated 17 C.F.R. § 166.3 by not diligently supervising the handling of Surety Federal accounts at Interstate. Although it vacated the ALJ's finding that the respondents had misused customer funds and fraudulently failed to disclose material facts, the Commission affirmed the ALJ's other liability rulings. It imposed fines on Interstate, Crothers, and Bigham

and revoked the registrations of the two individuals. Crothers petitions for review.[2] In our view, the evidence sufficiently supports the Commission's findings, and there is no merit to Crothers' other contentions. The petition for review is denied.

I

Interstate Securities Corporation ("Interstate") is a registered futures commission merchant. William R. Crothers was an account executive at Interstate and the vice president of its Government Bond Sales Department. Robert W. Bigham was another account executive at the firm. One of Interstate's clients was Surety Federal Savings & Loan Association ("Surety Federal") of Morganton, North Carolina.

In 1981, Crothers and Bigham met with Surety Federal's president, Billy Davis, and Charles Henson, the savings and loan's vice president, to discuss the possible participation of Surety Federal in the futures markets. After Davis made a report to Surety Federal's board of directors on the substance of this meeting, the board authorized the establishment of a futures account at Interstate.[3] The authorizing resolution provided in part: "The President or any Vice President of the Corporation, Billy S. Davis or Charles T. Henson be and they hereby are authorized and empowered ... to establish and maintain one or more accounts ... for the purpose of purchasing ... any and all commodities and/or contracts for future delivery thereof...." Davis completed the forms required to open the account (the "Surety Federal account").

In November 1981, Surety Federal hired Rickey Reynolds as its treasurer and controller. Reynolds and Davis met with Crothers to discuss a hedging strategy, and Surety Federal commenced trading futures on No-

---

1. A partner, officer, or employee of a futures commission merchant must be registered as an associated person with the CFTC in order to solicit or accept customer orders. 7 U.S.C. § 6k.

2. Bigham has separately petitioned for review of the Commission's ruling, but his case has not been consolidated with Crothers'. Interstate has not challenged the Commission's determination.

3. A new policy of the Federal Home Loan Bank Board (FHLBB) permitted savings and loan associations to engage in futures trading as a hedge against interest rate fluctuations. In mid–1981, Surety Federal, like other savings and loans, offered interest rates as high as 15% or 16% in order to attract deposits; however, its asset base was primarily limited to long-term mortgages with interest rates below 10%.

vember 24, 1981. On December 14, 1981, the Surety Federal board of directors voted to halt trading because "it felt it did not have a grasp" of the futures market and hedging strategy. A week later, on December 22, 1981, Crothers made a presentation to the board explaining hedging. The board then consented to resume futures trading. The board's second resolution authorizing futures transactions differed from the original resolution, however. It provided: "[T]he Board of Directors appoints Billy S. Davis as the person responsible for making trades in our futures program. Rickey Reynolds, Controller, will be responsible for the accounting entries and all reporting, while William Corruthers [sic], Interstate Securities Corporation, will be used primarily in verifying the strategy." Soon after the second resolution was adopted, Surety Federal commenced futures trading; however, despite the terms of the board's authorization, Reynolds, not Davis, instigated the trades.

The next summer, Surety Federal participated in a loan syndication to finance construction of a retirement village by Bermuda Village, Inc. Bermuda Village borrowed $14 million from Surety Federal and other savings and loans, although only $2 million was initially disbursed. Under the financing arrangement, Surety Federal would invest the remainder until the loan was fully disbursed. Reynolds met with Bigham and Crothers to discuss how best to invest these remaining funds. The brokers suggested to Reynolds that Surety Federal invest in 15% Government National Mortgage Association certificates (GNMAs) and also sell short T-bond futures in order to offset the risk, inherent in GNMAs, of rising interest rates. Reynolds accepted this advice, and Davis instructed Crothers to open a second futures account (the "Bermuda Village account") at Interstate. The Surety Federal board of directors did not approve the creation of, or even know of, the new futures account. Crothers also did not direct Davis to complete new account documents as required by Interstate's internal operating procedures.

Nevertheless, Crothers and Bigham began accepting futures trading orders from Reynolds in the new account. In mid-September 1982, Surety Federal held 140 short contracts in the Bermuda Village account.[4] At about this time, interest rates began to fall, and testimony before the ALJ revealed that Crothers and Reynolds were well aware that the Bermuda Village account was facing serious difficulties because of its short positions. Rather than inform the Surety Federal board of directors about the mounting losses in that account, however, Reynolds began to "day trade."[5] Hoping to reap future profits, he also elected to add more short T-bond contracts to the account, increasing the number of open contracts to 299 by the end of October. This strategy was unsuccessful because interest rates continued to fall throughout the autumn of 1982, and the Bermuda Village account declined sharply in value. Throughout this period, neither Crothers nor Bigham advised Surety Federal of the fact that Reynolds was engaging in trading that went well beyond the FHLBB's hedging guidelines.

Faced with margin calls on the Bermuda Village account, Reynolds transferred funds from the original Surety Federal account to the Bermuda Village account. In response to queries by Crothers and Bigham as to whether the board of directors had approved such transfers, Reynolds sent Interstate a personal letter stating that he was authorized to transfer funds between the accounts. Even though this letter was signed only by Reynolds, Crothers took no steps to ascertain the actual extent of Reynolds' authority.

By the end of November 1982, there were 363 open contracts in the Bermuda Village account. Reynolds began to offset these positions in December, and as a result, there were net realized losses of $1,083,504.70 on the account. Between November and March 1983, the number of open contracts in the Bermuda Village account fluctuated considerably. When Reynolds offset the March 1983

---

**4.** Crothers had recommended that maintaining 140 open contracts was an appropriate number to accomplish a complete hedge.

**5.** This involves establishing and offsetting the same futures position within one day.

contracts, there were additional net realized losses of $953,270.45.

The board of directors first learned of the Bermuda Village account in April 1983 when the FHLBB sent an examination report to Surety Federal, which revealed the losses as well as Reynolds' role in trading futures. In November 1983, Reynolds resigned, and he was later convicted of mail and wire fraud in connection with his futures activities. On September 29, 1987, the CFTC's Division of Enforcement initiated the present action, which led to the Commission's finding of liability and imposition of sanctions.

In petitioning this court for review, Crothers contends that there was not sufficient evidence to support the Commission's findings of unauthorized execution of trades and failure to supervise. He also argues that the Commission's proceedings were barred by the principle of *res judicata*, that he was not adequately represented before the ALJ because his counsel was burdened with a conflict of interest, and that the Commission failed to establish scienter. We first consider whether there was sufficient evidence to sustain Crothers' liability.

## II

■ The scope of our review of the sufficiency of the evidence is circumscribed because the "findings of the Commission as to the facts, if supported by the weight of the evidence, shall ... be conclusive." 7 U.S.C. § 9. Under this provision, "[w]e review the record in order to determine whether the factual findings of the Commission are supported by weight of the evidence. Under this standard we will uphold the Commission's findings if we deem them to have been justified." *Gimbel v. Commodity Futures Trading Comm'n*, 872 F.2d 196, 198–99 (7th Cir.1989) (citation omitted).

■ Section 4b(A) of the Commodities Exchange Act makes it unlawful "for any member of a contract market ... in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce ... to cheat or defraud ... [another] person." 7 U.S.C. § 6b(a)(i). Unauthorized trading constitutes a violation of section 4b when an associated person executes trades without the customer's permission or contrary to the customer's trading instructions. *Cange v. Stotler & Co.*, 826 F.2d 581, 589 (7th Cir.1987); *Haltmier v. Commodity Futures Trading Comm'n*, 554 F.2d 556, 560 (2d Cir.1977). Liability for unauthorized trading can also lie when a broker carries out trades in a corporate customer's account which were placed by an unauthorized employee of the customer. *Drexel Burnham Lambert Inc. v. Commodity Futures Trading Comm'n*, 850 F.2d 742, 748–49 (D.C.Cir.1988). Applying these principles, the Commission affirmed the ALJ's finding that Crothers engaged in unauthorized trading.

Crothers claims that this conclusion is erroneous because he was simply carrying out the instructions of Reynolds, whom Crothers contends was given actual authority by the Surety Federal board of directors to manage the futures accounts at Interstate. Crothers relies principally on the September 1981 board resolution to support his claim that Reynolds possessed actual authority.[6] We agree with the Commission, however, that any ambiguity in the resolution concerning which Surety Federal representatives were authorized to ·establish and maintain a futures account at Interstate was unambiguously clarified by the second board resolution effected three months later. That resolution provided: "The Board of Directors appoints Billy S. Davis as the person responsible for making trades in our futures program. Rickey Reynolds, Controller, will be responsible for accounting entries and all reporting...." Reynolds' role in the futures program was clearly established as a limited one.

We also agree with the Commission that there is little evidence to support Crothers'

---

**6.** The September 1981 resolution granted Davis and "any Vice–President" of Surety Federal the authority to maintain the futures account. At that time, Charles Henson was Surety Federal's sole vice president. In February 1982, five months after the original resolution and two months after the superseding December 1981 resolution, Reynolds was named a vice president of Surety Federal.

contention that Reynolds had actual authority to manage the futures accounts because of the decision of Surety Federal's president, Billy Davis, to delegate his trading duties to Reynolds. The general rule is that "a corporate officer 'normally has no authority to delegate special powers conferred on him ... which involve the exercise of judgment or discretion, unless he is expressly authorized to do so, or unless the circumstances are such that the authority is necessarily implied.'" *Evanston Bank v. Conticommodity Servs., Inc.,* 623 F.Supp. 1014, 1031 (N.D. Ill.1985) (quoting 2 Fletcher, *Cyclopedia of the Law of Private Corporations* § 503 (1982)). The buying and selling of futures contracts clearly involves the exercise of judgment and discretion. There is no question, therefore, that any attempted delegation by Davis, without express authority from the board, would have had no effect. Here, there is no language in the superseding Surety Federal board authorization that could be interpreted as giving Davis any power to delegate his authority. Crothers' argument consequently fails.

The finding of the Commission that Reynolds did not have apparent authority is also supported by the weight of the evidence. "[A]n agent is imbued with apparent authority to bind his or her principal if a third person could reasonably interpret acts or omissions of the principal as indicating that the agent has authority to act on behalf of the principal." *Metco Prods., Inc. v. NLRB,* 884 F.2d 156, 159 (4th Cir.1989). "To establish apparent authority the third party must show that, when dealing with the supposed agent, it relied upon the agent's authority in good faith, in the exercise of reasonable prudence." *Sansom Refining Co. v. Drexel Burnham Lambert, Inc.,* [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,-796 at 34,107 (CFTC July 20, 1987), *aff'd in part, rev'd in part sub nom. Drexel Burnham Lambert v. CFTC,* 850 F.2d 742 (D.C.Cir.1988).

Crothers points to no acts or omissions of the board which, reasonably interpreted, would indicate an intent to give Reynolds the authority to conduct trades. On the other hand, the December 1981 board resolution clearly granted exclusive authority to Davis to manage the Surety Federal account. The board never approved the opening of the Bermuda Village account, nor did it approve Reynolds' involvement in that account. There is no evidence that it was even aware of the account.

Furthermore, we agree with the Commission's observation that the most compelling evidence negating the notion that Reynolds had apparent authority to control the activity in Surety Federal's futures accounts was the nature of the activity itself. Although the board only approved hedging in the original futures account, Crothers watched, during a three month period, as Reynolds increased the number of open contracts in the Bermuda Village account while simultaneously engaging in speculative day trading. During that same period, Crothers expressed concern to Reynolds about the latter's authority to transfer funds between the original Security Federal account and the Bermuda Village account in order to meet margin calls. Reynolds' failure to provide appropriate documentation of his authority to make such transfers should have alerted Crothers to Reynolds' lack of authority. Crothers' failure to make any inquiries in this respect reflects a failure on his part to exercise reasonable prudence.

### III

■ We likewise conclude that the weight of the evidence supports the Commission's ruling that Crothers failed to supervise his customers' accounts as required by the Commission's regulations. Under 17 C.F.R. § 166.3:

Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents ... relating to its business as a Commission registrant.

The Commission affirmed the ALJ's conclusion that Crothers violated section 166.3 by failing to follow Interstate's established internal procedures.

It is true that an associated person with no supervisory duties is not subject to liability under section 166.3. In the parties' stipulation of facts, however, Crothers effectively conceded his supervisory role when he agreed that he "supervised five sales persons, including Bigham" during the relevant period and that "all hedging and ratio recommendations to savings and loans customers of ... Interstate were approved by [him] before they were implemented."

The ALJ and the Commission found Crothers' primary supervisory deficiency to be his failure to follow Interstate's internal control procedures in connection with the opening of the Bermuda Village account. At the hearing, Crothers acknowledged that Interstate routinely required certain documents to be executed to open a futures account and that a customer was required to execute a new set of opening documents for each new account. Yet, Crothers and Interstate opened the Bermuda Village account without any account opening documents, without requesting an authorizing corporate resolution from Surety Federal, and without obtaining a signature card from an individual at Surety Federal given authority to manage the account. Compliance with these internal policies was central to Interstate's ability to identify both the trading objectives and authorized agents of a corporate customer such as Surety Federal. Crothers' undisputed failure to adhere to these requirements supports the finding of liability under section 166.3.

## IV

■ Finally, there is little merit to Crothers' remaining contentions. We reject summarily his suggestion that the Commission's action was barred, under the principles of *res judicata* or collateral estoppel, on the ground that the issues at stake in this proceeding were previously litigated in a civil action brought by Surety Federal against Interstate

and others and dismissed on statute of limitations grounds. *See Surety Federal Savings & Loan Ass'n v. Rouse Woodstock, Inc.,* No. SH–C–85–419 (W.D.N.C. Apr. 29, 1987), *aff'd,* No. 87–3618, 1988 WL 45482 (4th Cir. May 6, 1988). Neither the Commission nor Crothers were parties to that action.

■ As to Crothers' argument that he was denied the effective assistance of counsel,[7] the constitutional right to effective assistance of counsel reaches only criminal or quasi-criminal proceedings and does not extend to administrative license revocation proceedings. *Plumer v. Maryland,* 915 F.2d 927, 931–32 (4th Cir.1990).

■ Crothers' last argument in this petition for review is that even if the transactions he effected on behalf of Surety Federal were unauthorized, the Commission failed to establish that he possessed the requisite scienter for liability under § 4b(A). This is equally meritless. "[R]ecklessness is sufficient to satisfy section 4b's scienter requirement." *Drexel Burnham Lambert,* 850 F.2d at 748. The record in this proceeding is replete with evidence that Crothers recklessly failed to determine that Reynolds lacked the authority to manage the futures accounts. Reynolds' failure to comply with a request for evidence of a specific authorization to transfer funds between futures accounts is an example of conduct on the part of Reynolds that should have alerted Crothers to this lack of authority. Equally probative is Crothers' failure to bring Reynolds' speculative trading to the attention of Surety Federal's board. The weight of the evidence more than adequately supports the Commission's finding that Crothers recklessly failed to determine whether the Reynolds' trades were authorized by Surety Federal.

In view of the above, Crothers' petition for review of the order of the Commodity Futures Trading Commission is denied.

*PETITION DENIED.*

---

7. Crothers contends that his counsel, in jointly representing Interstate, was burdened with a conflict of interest that should result in a reversal of the Commission's order.