NINILCHIK TRADITIONAL COUNCIL; Jack Kvasnikoff, Jr.,
Plaintiffs–Appellants,

v.

UNITED STATES of America; Bruce Babbitt, Defendants–Appellees.

No. 99–35017.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 31, 2000.

Filed Sept. 14, 2000.

---

William E. Caldwell and Carol H. Daniel, Alaska Legal Services Corporation, Fairbanks, Alaska, for the plaintiffs-appellants.

Todd Kim, Department of Justice Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Before: D.W. NELSON, REINHARDT, and THOMAS, Circuit Judges.

D.W. NELSON, Circuit Judge:

The Federal Subsistence Board, created by the Secretary of the Interior to administer "the subsistence taking and uses of fish and wildlife on public lands," 50 CFR § 100.10(a) (1999), imposed an antler size restriction on subsistence uses of moose in Game Management Unit ("GMU") 15 on the Kenai Peninsula. The Ninilchik Traditional Council and a subsistence hunter from the Ninilchik Tribe (collectively "NTC") appeal the district court's judgment upholding the Board's decision. We affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Congress, in 1980, enacted the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101 et seq., to protect the viability of subsistence living. Finding that rapid population growth in the state was leading to a decline in subsistence resources, see 16 U.S.C. § 3111(3) (1985), Congress accorded rural Alaska residents a priority to "the taking on public lands of fish and wildlife for nonwasteful subsistence uses ... over the taking on such lands of fish and wildlife for other purposes." 16 U.S.C. § 3114 (1985). Congress' aim in passing ANILCA was to ensure a way of life "essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence." § 3111(1).

The state, as authorized by Congress, see 16 U.S.C. § 3115(d) (1985), chose to supplant federal management of the subsistence priority by enacting and implementing its own regulatory scheme granting residents of rural communities a subsistence use preference. See 1986 Alaska Sess. Laws ch. 52. The state defines a rural area as "a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area." Alaska Stat. § 16.05.940(27). In 1989, however, the Alaska Supreme Court held

that the state subsistence laws violated the equal access provisions of the Alaska Constitution because the rural residency criterion "conclusively excludes all urban residents from subsistence hunting and fishing regardless of their individual characteristics...." *McDowell v. State,* 785 P.2d 1, 9 (Alaska 1989). The unenforceability of the state regime caused Alaska to fall out of compliance with ANILCA and the federal government assumed regulatory authority effective July 1, 1990. *See* 57 Fed.Reg. 22940 (1992).

Alaska is divided for administrative purposes into 26 GMUs, see 50 C.F.R. 100.4 (1999), and the lands at issue in this appeal lie within GMU 15. GMU 15 encompasses the western part of the Kenai Peninsula and is further divided into three subparts: 15A, 15B, and 15C. The state, when it was managing the subsistence use priority, prohibited subsistence hunting and fishing on most parts of the Kenai Peninsula by declaring it to be non-rural. The state also restricted nonsubsistence hunting of moose in the area by limiting hunters to harvesting bulls that have a spike or fork antler, a 50–inch antler spread, or at least three brow tines on one antler. The purpose of the limitation, referred to as the spike–fork/50–inch antler restriction, was to stem the excessive harvesting of the moose population by protecting a significant percentage of the breeding class of bulls. When the federal government assumed authority for regulating ANILCA, it adopted the state's regulatory scheme and initially continued to prohibit subsistence hunting in GMU 15. *See* 55 Fed. Reg. 27114, 27115 (1990).

In 1992, the Federal Subsistence Board, created by the Secretary of the Interior to administer the subsistence use priority, see 50 C.F.R. § 100.10(a), determined that Ninilchik and a number of other communities located on the Kenai Peninsula qualified as rural. *See* 50 C.F.R. § 100.23(a) (1999). The Board did not, however, make any findings as to whether these communities made customary and traditional use of

moose or any other species. Such use is defined in the regulations as "a long-established, consistent pattern of use, incorporating beliefs and customs which have been transmitted from generation to generation." 50 C.F.R. § 100.4. NTC, twice in 1992 and once in 1993, unsuccessfully petitioned the Board to make the requisite findings and permit subsistence hunting of moose and caribou on these lands.

The Southcentral Regional Council, established by the Board to "provide a regional forum for the collection and expression of opinions and recommendations" on subsistence management issues, 50 C.F.R. § 100.11(a) (1999), in February 1995, recommended that subsistence hunting be permitted in GMU 15. Specifically, the Council urged the Board to make a positive finding of customary and traditional use of moose for several Peninsula communities and to authorize a subsistence moose hunt, running from August 10 through September 20, with a bag limit of one bull per hunter with no antler size restrictions. A staff committee of the Fish and Wildlife Service opposed the Council's recommendation.

The Board, after releasing proposed regulations regarding the subsistence use of moose in GMU 15 for public review and comment, see 60 Fed.Reg. 24601 (1995), issued its final rule in August 1995, see 60 Fed.Reg. 40462 (1995). The Board adopted the Southcentral Regional Council's recommendation that Ninilchik and several other communities have customary and traditional use of moose in GMUs 15B and 15C but deferred a decision with respect to GMU 15A "because use of this subunit by residents of Ninilchik and Seldovia is extremely low." 60 Fed.Reg. 40462. In addition, the Board extended the spike–fork/50–inch antler restriction to subsistence hunters in GMUs 15B and 15C and authorized a harvest season running from August 10, 1995 through September 20, 1995, with the first ten days being reserved for subsistence hunts. See id.

Prior to the Board issuing its final rule, NTC petitioned for an expedited reconsideration of its decisions to apply the antler size restriction to subsistence hunters and to defer making a customary and traditional use determination for GMU 15A. Because the Board did not act on this request prior to the beginning of the moose season, NTC, on August 2, 1995, filed an action in district court asking for a temporary restraining order as well as declaratory and injunctive relief. The court denied NTC's request without reaching the merits for failure to exhaust the administrative remedies as required under 16 U.S.C. § 3117 (1985). The parties eventually negotiated a settlement whereby NTC agreed not to seek further preliminary injunctive relief regarding moose hunting in GMU 15 for the 1995–96 regulatory year. The court thereafter dismissed the action by stipulation without prejudice.

On January 26, 1996, NTC filed a complaint challenging the Board's decisions to restrict the subsistence use of moose in GMUs 15B and 15C per the antler size restriction and to defer making a customary and traditional use determination for GMU 15A. Meanwhile, in March 1996, the Southcentral Regional Council unsuccessfully recommended a modified harvest season running from August 15 through September 25, with no antler restrictions during the first and last five days of the season. The district court, in June 1996, upheld the antler size restriction but remanded the GMU 15A issue. On remand, the Board made a positive customary and traditional use finding for GMU 15A, extended the spike–fork/50–inch antler restriction to all of GMU 15, and adopted a harvest season for GMU 15A running from August 18 to September 20 with the first two days being reserved for subsistence use hunts.

Subsequent to the Board's actions pursuant to the district court's remand, NTC, in October 1996, filed an amended and supplemental complaint for declaratory relief limited to the validity of the antler size restriction. NTC then moved for summary judgment. The district court denied

the motion and dismissed the case for lack of jurisdiction because it concluded that NTC had failed to exhaust its administrative remedies. We reversed the district court and remanded for consideration of the motion for summary judgment on the merits. *See Ninilchik Traditional Council v. United States,* 152 F.3d 928, 1998 WL 417406 (9th Cir.1998). On October 19, 1998, the district court granted judgment to the government and subsequently denied NTC's motion for the cost of filing the notice of appeal made pursuant to Fed. R.App. R. 39(e)(4). NTC timely appeals.

## II. STATUTORY INTERPRETATION

The legislative priority for subsistence uses of fish and wildlife is inhered in § 3114 of ANILCA:

[T]he taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:

(1) customary and direct dependence upon the populations as the mainstay of livelihood;

(2) local residency; and

(3) the availability of alternative resources.

The Federal Subsistence Board reads this provision to require that priority be given to subsistence uses in the form of a meaningful preference over other uses. NTC, contesting this interpretation, argues that the Board must accord an absolute priority to the subsistence use of fish and wildlife and is therefore required to eliminate all nonsubsistence uses of such resources before restricting subsistence uses in any way.

As a preliminary matter, NTC asks us to give de novo review to the Board's interpretation of the term "priority" within the meaning of § 3114. NTC asserts that such review is appropriate as ANILCA "in the classic 'private attorney general' mold," provides for judicial enforcement of the priority requirement. *See* § 3117. We decline to apply de novo review, however, as the rule of judicial deference to an agency's interpretation of a statute it administers is well established. *See Sullivan v. Everhart,* 494 U.S. 83, 88–89, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990). Of relevance here, Congress delegated to the Secretary of the Interior the broad authority to "prescribe such regulations as are necessary and appropriate to carry out his responsibilities under [ANILCA]." 16 U.S.C. § 3124 (1985). We are thus prohibited from substituting our "own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see Tovar v. United States Postal Serv.,* 3 F.3d 1271, 1276 (9th Cir.1993).

We have, in fact, on at least two prior occasions deferred to the Secretary of the Interior's interpretation of ANILCA. In *Alaska v. Babbitt,* 72 F.3d 698 (9th Cir. 1995), and in *Native Village of Quinhagak v. United States,* 35 F.3d 388 (9th Cir. 1994), we considered the Secretary's construction of the term "public lands" within the meaning of § 3102(3) of ANILCA. In both cases, we deferred to the agency's interpretation and asked only whether it was reasonable, *see id.* at 392, and " 'based on a permissible construction of the statute.' " *Alaska,* 72 F.3d at 701 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778).

Even when the state's regulatory scheme was in place and we used de novo review to consider the state's reading of ANILCA, we noted that deference would be due if the federal government were administering the statute and explained the distinction:

Deference to a federal agency's interpretation of a statute is based in part on the expertise it possesses in implementing federal policy in the general subject area. While Alaska has a long history of managing large wilderness areas, it lacks the expertise in implementing federal laws and policies and the nationwide perspective characteristic of a federal agency. Federal agencies are also entitled to deference because their activities are subject to continuous congressional supervision by virtue of Congress's powers of advice and consent, appropriation, and oversight.... Most fundamentally, unlike a federal agency, the state is delegated no authority under ANILCA.... The state's role is thus more accurately characterized as supplanting the federal regulatory scheme, rather than implementing it.

*Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 316 (9th Cir.1988) (internal citation omitted); *see United States v. Alexander*, 938 F.2d 942, 946 n. 6 (9th Cir.1991) ("Because we are interpreting the meaning of a phrase that appears in a federal statute, [ANILCA,] we owe the state regulatory agency's interpretation no deference."). As the regulation being challenged here was issued by the Secretary of the Interior, and the rule was finalized after a notice-and-comment process, we will accord deference to the statutory interpretations underlying it. *See United States v. Haggar Apparel Co.*, 526 U.S. 380, 390, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999) (explaining that judicial deference to agency interpretations of statute is customary particularly where the agency administered a notice-and-comment process prior to issuing the regulations). "[N]othing in the regulation itself persuades us that the agency intended the regulation to have some lesser force and effect." *Id.*

■ To determine whether the agency's construction of the term "priority" within the meaning of § 3114 is reasonable, we begin with the language of the provision and read it in reference to the other parts of ANILCA: " 'We derive meaning from context, and this requires reading the relevant statutory provisions as a whole.' " *Pension Benefit Guar. Corp. v. Carter & Tillery Enter.*, 133 F.3d 1183, 1186 (9th Cir.1998) (quoting *In re Rufener Constr., Inc.*, 53 F.3d 1064, 1067 (9th Cir.1995)). Statutory interpretation is a referential endeavor. *See Smith v. United States*, 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("Language, of course, cannot be interpreted apart from context."). As a matter of related principle, we decline to read the priority Congress granted to subsistence uses in § 3114 in a manner inconsistent with the policies of other provisions of ANILCA. *See United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

As is evident throughout ANILCA, Congress places great emphasis on providing rural residents of Alaska with the opportunity to maintain a subsistence way of life. *See* 16 U.S.C. §§ 3101(c), 3111–12, 3114. Congress, however, articulates other statutory aims as well. In ANILCA's statement of purpose, for instance, Congress declares as a goal to "preserve wilderness resource values and related recreational opportunities including but not limited to hiking, canoeing, fishing, and sport hunting ...." § 3101(b). Conservation is another goal: "It is the intent of Congress in this Act ... to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation...." *Id.* Congress, in this regard, qualifies its preference for subsistence uses of fish and wildlife by requiring that they be restricted if necessary for the "continued viability" of such populations. § 3114.

Read as a whole, then, ANILCA provides for a number of important purposes all of which must be balanced by the Secretary of the Interior. Subsistence living, although at the heart of ANILCA, is not a per se preemptive statutory priority. Our case law does not require us to find otherwise. NTC contends that we have held, in *Alexander* and *Kenaitze Indian Tribe*,

that if any use restrictions are necessary, the Board must eliminate nonsubsistence uses before circumscribing subsistence uses. We did not, however, reach such a specific level of analysis in these cases with respect to the meaning of the term "priority" and instead made general statements paraphrasing § 3114: subsistence users living in rural areas have priority in the taking of fish and wildlife over nonsubsistence users, *see Kenaitze Indian Tribe,* 860 F.2d at 317; subsistence uses may not be restricted unless necessary to protect the continued viability of fish and wildlife populations, *see id.; Alexander,* 938 F.2d at 945; and subsistence uses, if they need to be restricted, must be limited according to the criteria outlined in § 3114, *see id.* at 946 n. 7. The Board's interpretation of the priority requirement does not contravene these provisions.

■ We "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778. In light of this deferential standard, we hold that the Federal Subsistence Board's reading of the term "priority" within the meaning of § 3114 as allowing it to balance the competing aims of subsistence use, conservation, and recreation, while at the same time providing subsistence hunters with a meaningful use preference, is reasonable. We address below whether the priority carved out by the Board for subsistence moose hunters is indeed meaningful.

## III. SPIKE–FORK/50–INCH ANTLER RESTRICTION

■ The crux of NTC's appeal is whether the Federal Subsistence Board's decision to impose the spike–fork/50–inch antler restriction on subsistence hunters in GMU 15 contravenes the priority requirement of § 3114. Our departure point in making this inquiry is determining the correct standard of review. NTC argues that de novo review is appropriate because

§ 3117 of ANILCA, the provision authorizing judicial enforcement of the subsistence priority as necessary, is silent with respect to whether the judicial review standard of the Administrative Procedure Act ("APA") should apply. To the contrary, we hold that a reviewing court must apply the deferential APA standard in the absence of a stated exception when reviewing federal agency decisions.

■ Section 706 of the APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1996). This provision is of general applicability "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a) (1996). Neither of these exceptions is relevant here. Congress has, moreover, specified that a "[s]ubsequent statute may not be held to supersede or modify [the APA] ... except to the extent that it does so expressly." 5 U.S.C. § 559 (1996). This language leaves us to conclude that challenges to agency actions are subject to the APA's judicial review standard unless Congress specifies a contrary intent, a conclusion fortified by a recent Supreme Court holding.

In *Dickinson v. Zurko,* 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999), the Supreme Court emphasized the importance of a consistent approach to reviewing agency actions in ruling that the APA applied to findings of fact made by the Patent and Trademark Office. The Court explained that the APA therefore generally governs judicial review of decisions made by federal agencies:

[W]e believe that respondents must show more than a possibility of a heightened standard, and indeed more than even a bare preponderance of evidence in their favor. Existence of the additional requirement must be clear.... A statutory intent that legis-

lative departure from the norm must be clear suggests a need for similar clarity in respect to grandfathered common law variations. The APA was meant to bring uniformity to a field full of variation and diversity. It would frustrate that purpose to permit divergence on the basis of a requirement "recognized" only as ambiguous.

527 U.S. at 154–55, 119 S.Ct. 1816 (1999). *See also Webster v. Doe,* 486 U.S. 592, 607, 108 S.Ct. 2047, 100 L.Ed.2d 632 n* (1988) (Scalia, J., dissenting) ("While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded, see 5 U.S.C. § 559."). We read Justice Breyer's majority opinion in *Dickinson* to mean that § 706 of the APA functions as a default judicial review standard.

NTC points to *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), and *Nabors v. United States,* 568 F.2d 657 (9th Cir.1978), to assert that de novo review is appropriate where nothing in the statutory language suggests "either that judicial review is limited to the administrative record or that the standards of the APA apply in any way to the 'civil action' authorized by the statutory grant of jurisdiction." These cases undermine, however, rather than support NTC's assertion. In *Chandler,* the Supreme Court held that federal employees are entitled to a trial de novo of their Title VII employment discrimination claims. *See* 425 U.S. at 845–46, 96 S.Ct. 1949. The Court did so, however, because "[t]he terminology employed by Congress [in § 706 of the Civil Rights Act of 1964] ... indicates clearly that the 'civil action' to which private-sector employees are entitled under the amended version of Title VII is to be a trial *de novo* " and "it would seem to follow syllogistically that federal employees are entitled to a trial *de novo* of their employment discrimination claims." *Id.* In *Nabors,* we built on the Court's holding in *Chandler* to find that de novo review was appropriate for considering claims brought

under the Age Discrimination in Employment Act of 1967 because its similarity to the Civil Rights Act "in form and substance" indicated that Congress "intended that the two Acts should have the same effect in that federal and private employees should both enjoy *de novo* civil actions under both Acts." 568 F.2d at 660. *Chandler, Nabors,* and other cases relied on by NTC to argue for de novo review support our holding today that such review is appropriate only where Congress has made a clear expression in its favor.

 We adopt the arbitrary and capricious standard and review the Board's decision to apply the spike–fork/50–inch antler restriction to subsistence uses of moose to determine whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Review under this standard is to be "searching and careful" but remains narrow as we are not to substitute our judgment for that of the agency's. *Id.* Such deference is especially appropriate here as the challenged decision implicates substantial agency expertise. *See Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993); *United States v. Alpine Land and Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989) ("Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving ... scientific matters.").

 In evaluating the merits of this issue, we must first consider whether the Board's application of the antler size restriction to subsistence hunters was necessary to "protect the continued viability" of the moose population as required under § 3114. The state first initiated the antler size restriction for nonsubsistence hunting on the Kenai Peninsula in 1987, when the bull component of the moose population had been devastated by excessive harvests under an any-bull regulation. Although the state considered other alternatives, in-

cluding quota hunts, limited permit hunts, and other antler size restrictions, it adopted the spike–fork/50–inch antler restriction as the method best suited to protect bulls most likely to reproduce. In the eight years following the implementation of the restriction, the bull:cow ratio increased from an average of 12:100 to an average of 26:100 for the entire Peninsula area.

In deciding to apply the spike–fork/50–inch antler restriction to subsistence hunters, the Board took into account biological data suggesting that, despite the recovery in bull numbers, allowing subsistence users to hunt all bulls would reverse the gains and jeopardize subsistence opportunities over the long term. This determination was based on the number of hunters expected to participate in the subsistence hunts, a projection derived from the percentage of participating households in a GMU similar in size to GMU 15 and on historic hunter efforts as gleaned from the Alaska Department of Fish and Game harvest reports. Consistent with the requirements of § 3114, the Board also considered the potential effect of alternative management strategies when coupled with an any-bull rule including harvest limits, shorter seasons, geographic restrictions, permit limits, and combinations of such options. The Board concluded, though, that "[n]one of the alternate management strategies could protect the middle-age bulls, whose survival was found essential to the health of the population because the any-bull subsistence hunt would reduce the number of such bulls to a dangerously low level." Based on this record of decision-making, we find that the Board considered the relevant factors in concluding that restrictions on subsistence uses are necessary to protect the continued viability of the bull moose population in GMU 15 as required under § 3114.

The remaining issue is whether the advance harvest season open only to subsistence hunters qualifies as a meaningful preference. The Board authorized a harvest season in GMUs 15B and 15C running from August 10, 1995 through September 20, 1995, with the first ten days being reserved for subsistence use hunts. For GMU 15A, the Board adopted a harvest season running from August 18 to September 20, reserving the first two days for subsistence hunters.

■ The record is not well developed in this regard but it does indicate that the Board considered the germane factor with respect to GMUs 15B and 15C. Staff of the Fish and Wildlife Service submitted a report to the Board explaining that the largest percentage of a moose harvest takes place during the first five days of a season. The staff, concluding that the ten-day advance season would therefore "in effect reallocate some of the harvest from non-subsistence to subsistence hunters," projected that the advance season would allow for 25 to 28 additional moose to be taken by subsistence hunters. The Board relied on this analysis to determine that the advance harvest season in GMUs 15B and 15C reserved for subsistence hunters qualifies as a meaningful preference within the meaning of § 3114, and we have no grounds to abrogate its judgment as arbitrary and capricious.

■ The Board fails, though, to provide any support for its conclusion that the two days reserved for subsistence hunters in GMU 15A qualify as a priority. The government explains that the advance season for GMU 15A is shorter than that authorized for GMUs 15B and 15C so as to prevent conflict with a state-regulated non-subsistence bow-and-arrow hunt which runs from August 10 through August 17. By its own admission, then, the Board restricted the harvesting of moose for subsistence uses in order to give preference to non-subsistence hunting in violation of the plain language of § 3114. The record is, moreover, void of any evidence to support a finding that the two-day advance season provides subsistence hunters with a meaningful preference. We are therefore com-

pelled to reject as arbitrary and capricious the Board's determination that the advance hunting season in GMU 15A qualifies as a priority within the meaning of § 3114 and remand this issue so that the district court can take such actions as are necessary to provide for the subsistence priority.

## IV. NOTICE OF APPEAL FILING FEE

 In October 1996, NTC filed a supplemental complaint in the district court asking for declaratory relief regarding the Board's imposition of the antler size restriction on subsistence hunters. The district court, in June 1997, dismissed the motion for lack of jurisdiction. We reversed the district court with respect to jurisdiction and NTC was therefore entitled to the cost of filing the notice of appeal pursuant to Fed. R.App. P. 39(e)(4). The district court, however, ruled that NTC could recover the fee only if "plaintiffs are prevailing parties" in the instant appeal. This ruling was in error and we direct the district court, on a renewed application for costs, to tax the government the notice of appeal filing fee.

The Federal Subsistence Board's decision to impose the spike–fork/50–inch antler restriction on subsistence uses of moose in GMU 15 is AFFIRMED in part and REVERSED in part. Each party shall bear their own costs.