**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHENLI CHU, | No. 13-73294 |
| *Petitioner*, | |
| | CFTC No. 07-R029 |
| v. | |
| U.S. COMMODITY FUTURES TRADING COMMISSION, | OPINION |
| *Respondent*. | |

On Petition for Review of an Order of the
Commodity Futures Trading Commission

Submitted November 17, 2015[*]
San Francisco, California

Filed May 25, 2016

Before: M. Margaret McKeown, Johnnie B. Rawlinson,
and Andre M. Davis,[**] Circuit Judges.

Opinion by Judge McKeown

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Andre M. Davis, Senior Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, sitting by designation.

## SUMMARY[***]

**Commodity Futures Trading Commission**

The panel denied an investor's petition for review of an order of the Commodity Futures Trading Commission ("CFTC"), determining that an independent commodity trading advisor "had actual knowledge and apparent authority" to conduct certain trades of commodities futures on behalf of the investor.

The panel held that it reviews CFTC's findings under 7 U.S.C. § 9 for substantial evidence. The panel also held that substantial evidence supported CFTC's decision that the independent commodity trading advisor made no material misrepresentation or omission, that there was no unauthorized trading, and that the record did not support a finding of fraud.

## COUNSEL

Robert E. Thompson, San Francisco, California, for Petitioner.

Jonathan L. Marcus, General Counsel, Robert A. Schwartz, Deputy General Counsel, Mary T. Connelly, Assistant General Counsel, Commodity Futures Trading Commission, Washington, D.C., for Respondent.

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

McKEOWN, Circuit Judge:

This appeal arises from the Commodity Futures Trading Commission's ("CFTC" or "Commission") determination that an independent commodity trading advisor "had actual and apparent authority" to conduct certain trades of commodities futures on behalf of an investor. Chenli Chu, a retiree with significant trading experience, received $500,000 following her husband's death. After consultation with Jennifer Huang, her long-time commodity trading advisor, and James Kelly, an account executive at her futures commission merchant ("FCM"), Peregrine Financial Group ("Peregrine"), Chu decided to place the funds in a new account with Peregrine.[1] Chu claims Kelly and Peregrine disregarded her account instructions and permitted Huang to conduct unauthorized trades in the account, in violation of 7 U.S.C. § 6b(a) and 17 C.F.R. §§ 166.2–166.3. The initial decision by the Administrative Law Judge ("ALJ") was in favor of Chu, but the CFTC reversed. We deny the petition for review of the CFTC's Order.

### BACKGROUND

Chu traded commodities with Huang for fifteen years before she opened the first of six trading accounts at

---

[1] A commodity trading advisor is an individual who, for compensation, advises others on the trading of commodity futures and other financial instruments. 7 U.S.C. § 1a(12). An FCM is an entity that solicits or accepts orders and money for the purchase or sale of commodity futures. 7 U.S.C. § 1a(28); *First Am. Disc. Corp. v. CFTC*, 222 F.3d 1008, 1010 (D.C. Cir. 2000) ("An FCM is the commodity market's equivalent of a securities brokerage house . . . .").

Peregrine.  Huang acted as her trading agent and commodity trading advisor and dealt with Kelly, a senior vice president for business development at Peregrine.  For her first Peregrine account, Chu signed a customer agreement and risk disclosure statement.  For the next four accounts, following standard industry practice, she signed a generic second account request form that authorized Peregrine "to use the account forms that [Chu had] already executed [for an older account] as the account forms for the new account" and provided that "all statements in those forms shall apply to the new account as if [Chu] had executed a complete set of new forms."

Chu also signed limited power of attorney documents for two accounts, naming Huang as Chu's trading agent and authorizing Peregrine to follow Huang's instructions in almost "every respect."  Chu expanded that power of attorney by granting Huang blanket trading authority on all accounts with Peregrine, "as well as any future accounts that I might open."  With those authorizations in place, both Chu and Huang regularly placed trading orders in Chu's accounts, with Chu closely monitoring activity and occasionally sending Kelly specific instructions.

After the death of her husband, Chu raised the idea of generating interest from the $500,000 she received.  Kelly advised her that to earn interest, she would have to move money to one of her existing accounts, or to a new account to purchase a Treasury Bill ("T-Bill").  On March 18, 2005, Chu opened the account that is the subject of this appeal.  She signed a standard second account request form, stating that Peregrine should open the account incorporating forms from one of her older accounts.  On that form she added handwritten instructions to "move $500K T-Bill" to the

account, though she never ordered a T-Bill.  She also wrote that commissions and fees for trades in the account would be fifty cents "one way" for each buy or sell order.  She further asked Peregrine to "link margin" for the account and two others, meaning that Chu authorized Peregrine to move assets among the three accounts to satisfy margin calls for trading losses.

On March 21, 2005, $500,000 was transferred to the new account and multiple transactions were later conducted using Chu's unique electronic access key or by Huang via phone.  Chu disputed only one of the trades at the time.  By early June 2005, Chu had suffered a net loss of over $500,000, and Huang sent an email to Kelly requesting that the account be closed.

Two years later, Chu filed an administrative complaint against Peregrine and Kelly, alleging that she had opened the account to earn interest, not to trade, and that Kelly and Peregrine had ignored her instructions and permitted unauthorized trading.  The ALJ agreed, finding that: (1) Peregrine and Kelly executed unauthorized trades requested by Huang, who lacked actual and apparent authority; (2) Peregrine failed to supervise the account; and (3) Peregrine and Kelly recklessly failed to follow Chu's instructions and failed to disclose material facts.  Those violations resulted in a loss to Chu of $500,000.

The CFTC stayed Chu's claims with respect to Peregrine pending the outcome of its bankruptcy proceedings.[2]  The

---

[2]  The automatic stay provision of the bankruptcy code, 11 U.S.C. § 362(a)(1), was in place because Peregrine filed for bankruptcy while the

CFTC reversed as to Kelly, finding ample undisputed evidence that Huang had actual and apparent authority to conduct the trades at issue with funds deposited in the account. The CFTC further concluded that Kelly had not misrepresented that a T-Bill would be purchased and that the funds would remain untraded.

## ANALYSIS

## I.  STANDARD OF REVIEW

We first address the standard of review. When enacted in 1922, 7 U.S.C. § 9 provided that "findings of the commission as to the facts, if supported by the weight of evidence, shall in like manner be conclusive." Grain Futures Act, ch. 369, § 6(b), 42 Stat. 998, 1002 (1922) (codified as amended at 7 U.S.C. § 9). This provision was first enacted as part of the Grain Futures Act. The Commission now referred to in 7 U.S.C. § 9 is the CFTC, a successor of the Grain Futures Administration. Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (codified as amended at 7 U.S.C. § 9). With respect to the CFTC, we reiterated the evidentiary standard: "[o]n appeal to this court, the factual findings of the CFTC are conclusive 'if supported by the weight of evidence.'" *Morris v. CFTC*, 980 F.2d 1289, 1292 (9th Cir. 1992) (citing 7 U.S.C. § 9). We interpreted the "weight of evidence" standard as equivalent to the

---

appeal before the CFTC was pending. As Chu acknowledges, her claims against Peregrine are not before this court.

preponderance of the evidence test. *Id.* (citing *Dohmen-Ramirez v. CFTC*, 837 F.2d 847, 856 (9th Cir. 1988)).[3]

In 2010, § 9 was amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, § 753(a), 124 Stat. 1376, 1750–54 (2010). The revised section grants the courts of appeals authority to "affirm, set aside, or modify [an] order of the Commission" but, unlike the previous iteration, does not specify a standard of review. *See* 7 U.S.C. § 9(11)(B)–(C).

Although the text is unambiguous, we note that Dodd-Frank's legislative history provides no insight into the rationale for dropping the "weight of evidence" standard. The House version of the legislation did not amend 7 U.S.C. § 9 at all. H.R. 4173, 111th Cong. (as passed by House, Dec. 11, 2009). Instead, the text of Section 753 was first introduced as an amendment to the draft bill in the Senate on

---

[3] Not all circuits agreed that "weight of evidence" equated to the preponderance standard. *Compare Crothers v. CFTC*, 33 F.3d 405, 409 (4th Cir. 1994) ("Under this standard we will uphold the Commission's findings if we deem them to have been justified."), *Purdy v. CFTC*, 968 F.2d 510, 518–19 (5th Cir. 1992) (applying substantial evidence review), *and Gimbel v. CFTC*, 872 F.2d 196, 199 (7th Cir. 1989) (stating that under the weight of evidence standard, the court "will uphold the Commission's findings if we deem them to have been justified"), *with Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999) ("These liability findings are conclusive if supported by the weight, or preponderance, of the evidence."), *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1564 (11th Cir. 1995) ("This standard requires that the factual findings be supported by the preponderance, or greater weight, of the evidence."), *and Monieson v. CFTC*, 996 F.2d 852, 858 (7th Cir. 1993) (relying on the weight of evidence as the standard of review without further definition, but noting that "[s]everal courts have equated the 'weight of the evidence' standard with the 'preponderance of the evidence' standard used in other contexts").

May 4, 2010, largely in its final form, but retaining the "weight of evidence" standard of review. 111 Cong. Rec. S3100 (daily ed. May 4, 2010) (statement of Sen. Maria Cantwell). That amending language was adopted in the final version passed by the Senate on May 20, 2010, again with the standard of review intact. H.R. 4173, 111th Cong. (as passed by Senate, May 20, 2010). During the reconciliation process, however, the standard of review was stripped out. *See* H.R. Rep. 111-517, at 386. Not only was the standard deleted, the Conference Committee also revised the first half of the final sentence in section 753, from which it deleted the standard of review, replacing the language that an appropriate court "*shall have jurisdiction* to affirm, set aside, or modify the order of the Commission" with language that a court "*may* affirm, set aside, or modify the order of the Commission." *Compare* H.R. 4173, 111th Cong. at 868 (Conference Report) (emphasis added), *with* H.R. Rep. 111-517, at 386 (emphasis added).

It bears noting that other provisions of Dodd-Frank do make specific reference to a standard of review. For example, § 718, which concerns determination of the status of novel derivative products, states that, on review, "[t]he court, in considering a petition filed pursuant to paragraph (1), shall give no deference to, or presumption in favor of, the views of either Commission." § 718(b)(3), 124 Stat. at 1654 (codified at 15 U.S.C. § 8306(b)(3)). Section 748 creates a new CFTC whistleblower program and specifies that courts of appeals should review award determinations by the CFTC "in accordance with section 706[] of title 5, United States

Code."**4** *See* § 748, 124 Stat. at 1742 (codified at 7 U.S.C. § 26); *see also* § 922(a), 124 Stat. at 1844 (codified at 15 U.S.C. § 78u-6(f)) (creating a similar program for the Securities and Exchange Commission and also providing that awards should be reviewed "in accordance with section 706 of Title 5").

In light of the plain text of the statute, the precise revisions of the Conference Committee and Congress's inclusion of a standard of review in other parts of the statute, we read the deletion of the "weight of evidence" standard as purposeful, not accidental. Thus we have no license to disregard the plain text of the statute. "Only when it is patently obvious to a reasonable reader that a drafting mistake has occurred may a court correct the mistake." *King v. Burwell*, 135 S. Ct. 2480, 2504–05 (2015). Such is not the case here. It is "'beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) (alteration in original) (quoting *United States v. Granderson*, 511 U.S. 39, 68 (1994) (concurring opinion)).

Where Congress does not specify a standard of review, an agency's factual findings are reviewed for substantial evidence under the Administrative Procedure Act, 5 U.S.C. § 706. *See Dickinson v. Zurko*, 527 U.S. 150, 154 (1999) (holding that a court reviewing agency action "must apply the APA's . . . review standards in the absence of an exception," in recognition of "the importance of maintaining a uniform

---

**4** Section 748 states that determinations should be reviewed "in accordance with section 7064 of title 5, United States Code," which does not exist. As noted in the published U.S. Code, the section 7064 reference "probably should be 'section 706.'" 7 U.S.C. § 26 (2012).

approach to judicial review of administrative action"); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) ("We read Justice Breyer's majority opinion in *Dickinson* to mean that § 706 of the APA functions as a default judicial review standard."); 3 Charles H. Koch, Jr., Administrative Law and Practice § 8.10 (3d ed. 2010) ("Judicial review of agency action starts with the judicial review sections of the APA . . . .  These provisions . . . act as an auxiliary to the judicial review expressly established by that scheme or fill the void where the statutory scheme fails to provide for review.").

Section 706 provides that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute . . . ." 5 U.S.C. § 706(2).  Under well established principles of administrative law, "[s]ubstantial evidence means more than a mere scintilla but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gebhart v. SEC*, 595 F.3d 1034, 1043 (9th Cir. 2010) (citing *NLRB v. Int'l Bd. of Elec. Workers, Local 48*, 345 F.3d 1049, 1053–54 (9th Cir. 2003)).  Although we interpret § 9 as subject to the substantial evidence standard, we would deny the petition under the preponderance standard as well.

## II.  REVIEW OF CFTC PROCEEDINGS

The essence of Chu's claim rests on a theory of unauthorized trading, namely that she never gave permission for Huang to conduct trades in the account and that Kelly, in

following Huang's directives, violated 17 C.F.R. § 166.2. The regulation prohibits transactions by any futures commission merchant or its associated persons unless the customer gives (1) specific authorization, including the precise interest and exact amount to be purchased or sold, or (2) written general authorization "to effect transactions in commodity interests for the account without the customer's specific authorization . . . ." 17 C.F.R. § 166.2. The FCM may "make trades ordered by someone other than the customer himself when that someone is designated by the customer to control the customer's account" or otherwise "has either actual or apparent authority to make the trades." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1083, 1088 (2d Cir. 1997).

Here, the CFTC's conclusion that Huang had actual authority to trade in the account is supported by substantial evidence. Chu gave Huang blanket trading authority over any future accounts, and when she opened the disputed account, incorporated the power of attorney documents from an older account.[5] Those authorizations came in the context of a long-standing relationship between Chu and Huang, with Huang trading on Chu's behalf in her other Peregrine accounts. In addition, close in time to opening the account in dispute, there was a series of emails between Chu and Huang and Chu and Kelly in which Chu confirmed that she wanted Huang to keep trading for her. These affirmative grants of authority easily

---

[5] Chu argues that Peregrine never ascertained whether she understood the account opening documents. However, Chu regularly communicated with Peregrine and Kelly through Huang and Huang's staff, who translated between English and Taiwanese, and Chu never claimed that she did not understand a document or that something was inaccurately translated.

fall within the definition of actual authority.  Actual authority "is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *Id.* (citation omitted).

Chu's fraud allegations fare no better.  She claims that Kelly encouraged her to open the account with the representation that it would be used to generate interest through the purchase of a $500,000 T-bill, but then ignored her instructions and allowed the account to be traded to a total loss.

Under 7 U.S.C. § 6b(a)(2),  it is unlawful for a person to "cheat or defraud" a customer through trades, or to willfully "deceive or attempt to deceive the other person . . . ." Liability under § 6b contains an element of scienter which is more than "[m]ere negligence, mistake, or inadvertence." *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 (9th Cir. 1990).

This case appears to be—at worst—one of misunderstanding on Chu's part, not Kelly's intentional disregard for Chu's instructions.  Chu never ordered a T-Bill, and had there been one in the account, Peregrine would have had to cash the bill to satisfy margin calls.[6]  Chu's specification that "margin be linked" among the accounts was

---

[6] Chu argues that the one-page account opening form did not contain a required risk disclosure statement, but fails to acknowledge that the form incorporated the risk disclosure statement for an older account.  Chu used the same account opening form for all of her older accounts without objection.

thus inconsistent with her claim that the account was to be an interest-only account.  Nor did Kelly commit fraud in failing to inform Chu that Huang was trading in the account.  The Commission noted in its Order that "Chu's purported desire to generate interest in the account and use a T-Bill from another account . . . does not establish that Chu limited Huang's trading authority."  None of Chu's emails to Kelly reference any trading limitation, nor did the notation about the T-Bill limit or change Chu's explicit instructions, as outlined above, that Huang had blanket trading authority. Chu was clearly aware of the ongoing trading, having objected to one trade in which a risk manager had placed a stop. Accordingly, substantial evidence supports the CFTC's decision that Kelly made no material misrepresentation or omission, that there was no unauthorized trading, and that the record does not support a finding of fraud.

**PETITION DENIED.**