Dissent by Judge PREGERSON
OPINION
BYBEE, Circuit Judge:
Rufino Peralta-Sanchez (Peralta) was convicted of illegal entry in violation of 8 U.S.C. § 1325 and illegal reentry in violation of 8 U.S.C. § 1326. The predicate for his illegal reentry count was his expedited removal in 2012. Peralta argues that his expedited removal was fundamentally unfair and thus cannot serve as the basis of the illegal reentry count, because he was neither entitled to hire counsel nor advised of his right to apply for withdrawal of his application for admission. We find that Peralta had no Fifth Amendment due process right to hire counsel[1] in the expedited removal proceeding and that he was not prejudiced by the government’s failure to inform him of the possibility of withdrawal relief. Concluding that his 2012 expedited removal was not fundamentally unfair, we affirm his § 1326 conviction and sentence for illegal reentry. Because the revocation of his supervised release was premised on the § 1326 conviction, we affirm the district court’s revocation as well.
I. FACTS AND PROCEEDINGS
A. The Facts
On March 7, 2014, at approximately 11:20 p.m., video surveillance along the U.S.-Mexico border spotted two individuals *1128 hiding in the brush about one mile north of the border. U.S. Border Patrol agents spent four to five hours tracking fresh footprints, which ultimately led the agents to Rufino Peralta-Sanchez and his companion, who were by that time approximately six miles from the border. A Border Patrol agent conducted a field interview, during which Peralta admitted to being a Mexican citizen without documents permitting him to enter or remain in the United States. The agents gave Peralta a Miranda warning, and Peralta agreed to talk and to waive his right to counsel. In a post-arrest interview, he stated that he was a citizen of Mexico; had no documents allowing him to enter or remain in the United States; had entered the United States illegally on March 7, 2014; had been previously deported from the United States; and had crossed the border from Mexico in order to travel to Fresno, California. Peralta was eventually charged with one count of improper entry by an alien, 8 U.S.C. § 1325, and one count of being a removed alien found in the United States, 8 U.S.C. § 1326. At the time of his arrest, he was still on supervised release for his most recent felony conviction for reentering the United States illegally.
Peralta first entered the United States in 1979 at the age of twenty. He obtained legal status in 1986 and became a lawful permanent resident (LPR) in December 1990. Between 1990 and 2000, he maintained a relationship with a woman with whom he has three U.S. citizen children. Peralta’s criminal history, including a history of immigration offenses, is extensive. In 1982, Peralta was arrested in Bakersfield, California, under the name Gabriel Sanchez for arson, although these charges were eventually dismissed. He was arrested in 1983 under the same name, again for arson. In 1990, he was arrested in Fresno under the name Rufino Peralta-Sanchez for giving a false identification to a peace officer. Between 1990 and 1996, Peralta collected a string of driving under the influence (DUI) convictions: five misdemeanor convictions and a 1996 felony DUI conviction for which he was sentenced to 16 months in prison. As a result of the 1996 felony DUI conviction, the then-immigration and Naturalization Service (INS) issued Peralta a Notice to Appear, charging him as removable for having been convicted of an aggravated felony “crime of violence.” Peralta was ordered removed on June 7,1999.
Peralta returned regularly to the United States. In January 2000, he was again convicted of felony DUI, as well as possession of cocaine, for which he was sentenced to 28 months in prison. Following this conviction, Peralta was convicted of misdemeanor illegal reentry. After serving his sentence, Peralta’s 1999 removal order was reinstated in December 2001, and he was again removed from the United States. Undeterred, Peralta entered the United States again and was convicted of felony reentry in October 2002, for which he received 30 months in prison. After serving this sentence, his 1999 order of removal was again reinstated in July 2004, and he was again removed from the United States. After another illegal reentry, the 1999 deportation order was again reinstated on May 23, 2012, and Peralta was again removed. Three days later, Peralta was again apprehended by Border Patrol agents one mile north of the border, hiding in the brush with two others.[2] He immediately admitted to being a Mexican citizen with no legal documents to enter the United States and, in a post-arrest interview, admitted that he had entered the United States by walking through the desert with *1129 the intent to travel to Los Angeles to find work. On July 17, 2012, Peralta was charged with and convicted of misdemean- or illegal reentry and sentenced to time served. He was ordered removed via expedited removal proceeding and removed on July 18. On July 22, Peralta returned again, was arrested, and in November 2012, was convicted of felony illegal reentry and sentenced to 21 months in prison. He was removed on January 30, 2014, and returned on March 7, 2014, bringing us back to this case, which arises out of Per-alta’s arrest on March 8, 2014.[3]
B. The Proceedings
As a result of his March 2014 arrest, Peralta was charged with improper entry into the United States under 8 U.S.C. § 1325 (count one) and with being a removed alien found in the United States in violation of 8 U.S.C. § 1326 (count two). Peralta moved to dismiss count two, arguing that his underlying 1999 and 2012 removal orders violated due process. Peralta argued that his original 1999 removal was invalid because felony DUI is no longer considered a crime of violence.[4] He also argued that his July 2012 expedited removal was invalid because he was deprived of his purported due process rights to counsel in an expedited removal proceeding and to be informed of his right to seek withdrawal of his application for admission to the United States.
The district court initially rejected Per-alta’s argument regarding his 1999 removal and denied the motion to dismiss count two of the indictment. It found that Peral-ta had suffered no due process violation, and that if he had, he suffered no prejudice because he did not qualify for any discretionary relief. Peralta was convicted on both counts of the indictment following a bench trial. He then filed a motion to reconsider the dismissal of count two. The district court denied the motion. However, in light of our then-recent decision in United States v. Aguilera-Rios, 754 F.3d 1105 (9th Cir. 2014), as amended, 769 F.3d 626, in which we held that intervening higher authority should be retroactively applied in determining whether an alien was deporta-ble as charged, the district court concluded that Aguilera-Rios called into question the validity of the 1999 removal order. Nevertheless, the district court denied the motion to dismiss because Peralta’s 2012 expedited removal was valid. Peralta was sentenced to 24 months in prison on the § 1325 charge and 30 months in prison on the § 1326 charge, to run concurrently. He was also sentenced to 10 months in prison, to run consecutively, for violating the conditions of his supervised release from his November 2012 conviction.
On appeal, Peralta challenges the validity of both the 1999 and 2012 removal orders. We examine' only the 2012 expedited removal, as this was the removal order on which the district court ultimately relied in sustaining Peralta’s § 1326 conviction. We have jurisdiction under 18 U.S.C. § 3231.
*1130 II. STATUTORY AND CONSTITUTIONAL FRAMEWORK
A. Expedited Removal and Illegal Reentry
1. Expedited removal
Expedited removal proceedings under 8 U.S.C. § 1225 are limited to aliens arriving in the United States, “whether or not at a designated port of arrival”; and aliens “who ha[ve] not been admitted or paroled into the United States” and cannot show that they have been continuously present in the United States for two years “immediately prior to the date of determination of inadmissibility.” 8 U.S.C. § 1225(a)(1), (b)(l)(A)(iii)(II); 8 C.F.R. § 235.3(b)(1)(h).[5] Section 1225 gives the Secretary of Homeland Security[6] “sole and unreviewable discretion” to designate which, if any, aliens described in the latter category — those arriving in the United States who have not been admitted or paroled into the United States and have not been continuously present for the last two years — will be subject to expedited removal. 8 U.S.C. § 1225(b)(l)(A)(iii)(I). By order, the Secre-> tary of Homeland Security has determined to use the expedited removal procedure for those aliens (1) “who are physically present in the U.S. without having been admitted or paroled,” (2) who are found “within 100 air miles of the U.S. international land border,” and (3) who cannot establish that they have been physically present in the United States for the immediately preceding fourteen days. Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48880 (Aug. 11, 2004).
If an immigration officer, after conducting an inspection, determines that such an alien does not possess valid entry documents, has presented fraudulent documents, or has made a false claim of U.S. citizenship, “the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum ... or a fear of persecution.” 8 U.S.C. § 1225(b)(l)(A)(i); see also id. § 1182(a)(6)(C), (a)(7). When making a finding of inadmissibility, the officer must create a record of the facts and statements made by the alien, read the statement containing these facts to the alien, explain the charges against the alien, and give the alien a chance to respond to the charges in a sworn statement. 8 C.F.R. § 235.3(b)(2)©. In short, the alien is provided with notice of the charges against him or her and given an opportunity to respond. In contrast to the statutes governing formal removal proceedings under § 1229a or the removal of aggravated felons under § 1228, the statutes and regulations governing expedited removal proceedings do not provide that the alien may be represented by counsel.
Except in a limited category of cases (not applicable here), an alien who is determined to be inadmissible via § 1225 proceedings is not entitled to administrative or judicial appeal. The Attorney General, however, has discretion to grant withdrawal of the alien’s application for admission. 8 U.S.C. § 1225(a)(4); see also id. § 1225(b)(1)(C) (noting that an alien who claims to be an LPR, a refugee, or an asylee may be entitled to appeal). If the *1131 Attorney General permits an alien to withdraw his application for admission, the alien must “depart immediately'from the United States.” Id. § 1225(a)(4).
2. Illegal reentry
Section 1326 punishes an alien who has been “denied admission, excluded, deported, or removed” and later “enters, attempts to enter, or is at any time found in, the United States” without permission. 8 U.S.G. § 1326(a)(1), (2); see United States v. Barajas-Alvarado, 655 F.3d 1077, 1079 (9th Cir. 2011). Although an alien has no right to appeal an expedited removal order, “[a] defendant charged under § 1326 has a due process right ‘to collaterally attack his removal order because the removal order serves as a predicate element of his conviction.’ ” United States v. Raya-Vaca, 771 F.3d 1195, 1201 (9th Cir. 2014) (quoting United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1047 (9th Cir. 2004)). In order to challenge a criminal charge under § 1326, a defendant must show that: (1) he has exhausted administrative remedies for seeking relief from the underlying order of removal; (2) the deportation proceedings “improperly deprived” him of the opportunity for judicial review; and (3) the removal order was “fundamentally unfair.” 8 U.S.C. § 1326(d); Raya-Vaca, 771 F.3d at 1201-02.[7] To show that a removal order was fundamentally unfair, the defendant must demonstrate that the proceeding violated his due process rights and that he suffered prejudice as a result of that violation. Raya-Vaca, 771 F.3d at 1202.
Where a motion to dismiss a § 1326 charge is based on an alleged due process violation in the underlying removal proceeding, we review the denial of the motion to dismiss de novo. United States v. Camacho-Lopez, 450 F.3d 928, 929 (9th Cir. 2006). We review the district court’s findings of fact for clear error. Id.
B. Rights Under the Due Process Clause
Aliens who “enter” the United States are entitled to some measure of due process under the Due Process Clauses of the Fifth and Fourteenth Amendments before the government acts to deprive them of life, liberty, or property. See Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (“[T]he Due Process Clause applies to all ‘persons’ within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.”); see also Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). Here, there does not appear to be any dispute that Peralta effected entry into the United States prior to his 2012 expedited removal when he crossed the border free from “official restraint.”[8] We will therefore as *1132 sume that Peralta is an alien to whom the Due Process Clause applies.
We have held that an alien facing deportation faces the loss of a liberty interest. An alien, like Peralta, has a right to removal proceedings that conform to the requirements of due process. See Raya-Vaca, 771 F.3d at 1203 & n.6; Flores-Chavez v. Ashcroft, 362 F.3d 1150, 1161 (9th Cir. 2004). However, the fact that aliens are protected by the Due Process Clause does not mean that “all aliens are entitled to enjoy all the advantages of citizenship or ... that all aliens must be placed in a single homogenous legal classification.” Mathews, 426 U.S. at 78, 96 S.Ct. 1883. “[T]he class of aliens is itself a hete-rogenous multitude of persons with a wide-ranging variety of ties to this country.” Id. at 78-79, 96 S.Ct. 1883.
[[Image here]]
The question we must ask in this case is: To what process — statutory and constitutional — was Peralta entitled?
III. PERALTA’S CLAIMS
Due process requires, at a minimum, notice and an opportunity to respond. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The regulations governing expedited removal proceedings require an alien to be given notice and an opportunity to respond to the charge of inadmissibility. 8 C.F.R. § 235.3(b)(2)®. Peralta does not dispute that the government complied with these regulations. He argues, however, that because he was caught a mile inside the U.S. border — as opposed to being arrested at an official port of entry — he is entitled to more than just notice and an opportunity to respond. As we have noted previously, “[alliens who have entered the country are thus distinct from aliens at a port of entry, over whom Congress has plenary power and for whom the process prescribed by Congress constitutes due process.” Raya-Vaca, 771 F.3d at 1203 n.5 (citation omitted). Peralta argues that he suffered two due process violations: first, that he was not advised of his right to obtain counsel; and second, that he was not notified that he might be entitled to withdraw his application for admission to the United States. We address each argument in turn.
A. Right to Obtain Counsel
“The right to counsel in immigration proceedings is rooted in the Due Process Clause.... ” Biwot v. Gonzales, 403 F.3d 1094, 1098 (9th Cir. 2005). “Although there is no Sixth Amendment right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the Fifth Amendment guarantee of due process that adhere to individuals that are the subject of removal proceedings.” Tawadrus v. Ashcroft, 364 F.3d 1099, 1103 (9th Cir. 2004). We have never addressed, however, whether due process requires that an alien be offered the opportunity to secure counsel in the context of an expedited removal under § 1225.[9]
There are two questions to be answered on this issue. The first is whether Peralta had a statutory right to counsel at no *1133 expense to the government. If so, due process may require that he be notified of that right, as we have held in other cases in which the applicable statute or regulation provided that the alien may be represented by counsel. See, e.g., United States v. Reyes-Bonilla, 671 F.3d 1036, 1045-46 (9th Cir. 2012) (finding that an alien was denied due process where he was not properly advised of his statutory right to counsel in a § 1228 proceeding). If Peralta has no statutory right, then the second question is whether the Due Process Clause of the Fifth Amendment independently gives Peralta the right to obtain counsel at no expense to the government.
1. Statutory right to counsel
Congress has provided that aliens may be represented by counsel in certain proceedings. For example, 8 U.S.C. § 1362 provides that “[i]n any removal proceedings before an immigration judge ... the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.” Similarly, § 1228, which governs expedited removal of aggravated felons, and § 1229a, which governs formal removal proceedings, provide that an alien has the right to representation at no expense to the government. See 8 U.S.C. §§ 1228(b)(4)(B), 1229a(b)(4)(A). None of these provisions applies to Peral-ta. “[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.” Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (alteration in original) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972) (per curiam)). Consistent with this rule of construction, the federal regulations governing removal proceedings provide that “[e]xcept in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act[, located at 8 U.S.C. § 1225(b)(1)(A),]” an alien must be provided with notice of the right to be represented at no expense to the government. 8 C.F.R. § 287.3; see Barajas-Alvarado, 655 F.3d at 1088 (noting that expedited removal proceedings do not provide a right to counsel). Peralta will have to look elsewhere for a statutory right to counsel.
Peralta argues that he has a general right to be represented by counsel of his choice under the Administrative Procedure ■ Act (APA). Section 555 of the APA provides that “[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative” and that “[a] party is entitled to appear in person or by or with counsel or other qualified representative in an agency proceeding.” 5 U.S.C. § 555(b). Peralta has not referred us to any law or case indicating that this provision extends the right to counsel to immigration proceedings.
This failure is not surprising because the Supreme Court has long held that deportation proceedings are not governed by the APA. See Ardestani v. INS, 502 U.S. 129, 133, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991); Marcello v. Bonds, 349 U.S. 302, 310, 75 S.Ct. 757, 99 L.Ed. 1107 (1955). In Wong Yang Sung v. McGrath, 339 U.S. 33, 53, 70 S.Ct. 445, 94 L.Ed. 616 (1950), the Court held that the APA applied to deportation proceedings conducted under the Immigration Act of 1917. In Marcello, the Court revisited its decision in Wong Yang Sung in light of the new Immigration and Nationality Act of 1952. Marcello, 349 U.S. at 306-07, 75 S.Ct. 757. The Marcello Court concluded, however, that the procedures set up by the Immigration and Nationality Act (INA) superseded the procedures pro *1134 vided for by the APA. Id. at 308-10, 75 S.Ct. 757. The Court wrote that “it is clear that Congress was setting up a specialized administrative procedure applicable to deportation hearings, drawing liberally on the analogous provisions of the Administrative Procedure Act and adapting them to the particular needs of the deportation process.” Id. at 308, 75 S.Ct. 757. Congress used the APA “only as a model, and when ... there was a departure from the Administrative Procedure Act — based on novel features in the deportation process— surely it was the intention of the Congress to have the deviation apply and not the general model.” Id. at 309, 75 S.Ct. 757. The Court reaffirmed Marcello in Ardesta-ni, noting that
Marcello does not hold simply that deportation proceedings are subject to the APA except for specific deviations sanctioned by the INA. Rather, Marcello rests in large part on the statute’s prescription that the INA “shall be the sole and exclusive procedure for determining the deportability of an alien under this section.”
Ardestani, 502 U.S. at 134, 112 S.Ct. 515 (emphases.in original) (quoting Immigration and Naturalization Act of 1952 § 242(b) (codified as amended at 8 U.S.C. § 1229a(a)(3))).
Peralta points out that the Supreme Court has applied the APA to the BIA. See, e.g., Judulang v. Holder, 565 U.S. 42, 132 S.Ct. 476, 483-84, 181 L.Ed.2d 449 (2011). But Judulang did nothing more than apply the “analytic framework” of the judicial review provisions — the “standard ‘arbitrary [or] capricious’ review” — of § 706 of the APA. See id. at 483 n.7 (alteration in original). This is in no way inconsistent with the Court’s approach in Mar-cello and Ardestani. “[Section] 706 of the APA functions as a default judicial review standard.” Ninilchik Traditional Council v. United States, 227 F.3d 1186, 1194 (9th Cir. 2000); see Bowen v. Massachusetts, 487 U.S. 879, 903-04, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); Abbott Labs. v. Gardner, 387 U.S. 136, 140-41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). There is nothing novel here: Congress displaced the adjudicatory provisions of the APA with the INA; by contrast, it left the judicial review provisions of the APA in place, and the BIA’s actions are subject to those review provisions.
We conclude that these proceedings are governed by the INA, and in this case, 8 U.S.C. § 1225 specifically. Peralta has no statutory right to obtain counsel in an expedited proceeding.
2. Due process right to counsel
Because he has no statutory right to obtain counsel in an expedited proceeding, Peralta asks us to find that he has a constitutional right to do so. In this context, Peralta is asking us to find the INA unconstitutional because § 1225 does not provide an alien a right to counsel and, as we noted in the prior section in this context, we must presume the omission is deliberate. Thus, Peralta has a due process right to obtain counsel only if we are persuaded that Congress was wrong to omit it from the adjudicative scheme it created. “Judging the constitutionality of an Act of Congress is properly considered ‘the gravest and most delicate duty that [a court] is called upon to perform....’” Walters v. Nat’l Ass’n of Radiation Survivors, 473 U.S. 305, 319, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (quoting Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)). “[D]eference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.” Id. at 319-20, 105 S.Ct. 3180. This deference is particularly powerful in the area of immigration and naturalization because “the power to expel or exclude aliens [is] a fundamental sovereign *1135 attribute exercised by the Government’s political departments largely immune from judicial control.” Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953); see also Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (“‘[0]ver no conceivable subject is the legislative power of Congress more complete than it is over’ the admission of aliens.” (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909))).
The constitutional sufficiency of the procedures Congress provided in expedited removal proceedings under the INA is determined by application of the balancing test articulated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Under Mathews, we analyze existing procedures and additional proposed procedures based on: (1) the nature of the private interest at stake; (2) the risk of erroneous deprivation of that interest through the existing procedures, as well as the value of the proposed safeguard; and (3) the government’s interest, including the additional financial or administrative burden the proposed procedure would impose. Id. at 335, 96 S.Ct. 893. We note that “the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case; rather, ‘procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.’ ” Walters, 473 U.S. at 321, 105 S.Ct. 3180 (quoting Mathews, 424 U.S. at 344, 96 S.Ct. 893).
a. Nature of the private interest at stake
The Supreme Court has recognized that deportation “visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom.” Bridges v. Wixon, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). We have added that “[t]he high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel.” Biwot, 403 F.3d at 1098. These statements, however, were made in the context of formal removal proceedings before an immigration judge, proceedings for aliens who had been present in the United States for some period of time longer than a few minutes or hours. We do not appear to have ever specifically considered the interest at stake for an alien facing expedited removal under § 1225.
Unlike other types of removal proceedings, proceedings under § 1225 apply only to “arriving aliens” and aliens found in the United States who have no valid entry documents and cannot establish that they have been here for at least fourteen days. See 8 C.F.R. §§ 1.2, 235.3(b)(1); 69 Fed. Reg. at 48880. These proceedings are essentially exclusion proceedings, even if they can in some instances be applied to aliens who may have technically effected entry into the United States — like Peral-ta — because the alien crossed the border at somewhere other than a designated port-of-entry and did so free of “official restraint.” The provision targets aliens who have either no residence here or only a limited residence. Such an alien’s interest in remaining in the United States is therefore much more limited than that of an alien already living here who has been placed in formal removal proceedings and stands to lose, perhaps, formal legal status here, and certainly the life he or she has created here.[10]
*1136 Indeed, had Peralta attempted to enter at a designated port-of-entry, he would have had no interest in remaining in the United States, and would be entitled to no process but that which Congress has chosen to give him in § 1225. See Shaughnessy, 338 U.S. at 544, 70 S.Ct. 309; United States v. Sanchez-Aguilar, 719 F.3d 1108, 1112 (9th Cir. 2013); Barajas-Alvarado, 655 F.3d at 1084, 1088; Pazcoguin v. Radcliffe, 292 F.3d 1209, 1218 (9th Cir. 2002). We cannot think that Peralta’s interest— or that of any alien covered by § 1225 — is substantially greater than that of an alien denied admission at a port-of-entry and placed in the very same expedited removal proceedings simply because Peralta managed to evade the Border Patrol until he was several miles inside the United States. To hold otherwise would create perverse incentives for aliens attempting to enter the United States to further circumvent our immigration laws by avoiding designated ports-of-entry.
• We conclude that an alien subject to expedited removal proceedings under § 1225 has only a limited interest at stake, and a much less significant interest than those subject to removal proceedings under §§ 1228 and 1229a.
b. Risk of erroneous deprivation
We likewise conclude that risk of error in the context of § 1225 removal proceedings is low, and that enabling an alien to retain counsel would not improve the accuracy of the proceedings. We recognize that expedited removal proceedings permit no judicial or administrative review, which we assume would decrease any risk of error. In this case, however, the class of aliens to which expedited removal applies is fairly narrow, and the analysis required to determine whether an alien may be subject to expedited removal proceedings is straightforward: the immigration officer need determine only whether an alien has valid documents to enter or remain in the United States. See 8 U.S.C. § 1225(b)(1). This is a relatively simple exercise. We note as well that aliens who would otherwise be subject to expedited removal, but who seek asylum or who claim a fear of persecution, or claim to have LPR status, are entitled to further process under § 1225 before removal proceedings can take place. Id. § 1225(b)(l)(A)(i); 8 C.F.R. § 1235.3(b)(4), (5). Peralta points to no evidence suggesting that aliens are being wrongfully removed via expedited removal proceedings because of a lack of additional process, including a right to counsel.[11]
*1137 It is therefore unclear what added value counsel could provide in expedited removal proceedings. In contrast, formal removal proceedings, as we have already noted, are very much akin to a trial, involving various different stages and potentially complex procedural matters in which the assistance of counsel could be invaluable in helping an alien navigate the process. Expedited removal proceedings, by design, involve none of these complications, and the principal inquiry is a simple factual one. We are concerned that requiring more process would fundamentally alter Congress’s scheme without adding any significant protection for aliens in expedited removal proceedings.
Peralta argues, however, that counsel could help an alien subject to expedited removal proceedings obtain withdrawal relief. See 8 U.S.C. § 1225(a)(4). Withdrawal relief, though, implies that the alien unlawfully entered or attempted to enter the United States, meaning that the alien was properly subject to expedited removal proceedings in the first place. In other words, withdrawal relief simply provides an alternative avenue of removal. See id. This argument does not prove that counsel would be of assistance in preventing an alien from being wrongfully placed in expedited removal proceedings or wrongfully removed as a result.
Peralta also argues that counsel could provide assistance in cases like his, where a subsequent change in the law calls into question a previous order of removal. In 1999, Peralta was ordered removed because he had a felony DUI and, under BIA decisions, was considered an aggravated felon, a status that we and the Supreme Court later reversed. Leocal v. Ashcroft, 543 U.S. 1, 13, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004); United States v. Trinidad-Aquino, 259 F.3d 1140, 1146-47 (9th Cir. 2001). We recognize that Peralta lost his LPR status as a result of this removal proceeding and that this indirectly led to his expedited removal in 2012. But allowing Peralta to obtain counsel at an expedited removal hearing would not have prevented any “erroneous deprivation” of his rights in the sense that Mathews v. Eldridge contemplates. Any “error” in Peral-ta’s 1999 removal order was the result of a broad policy that was successfully challenged in the courts. Even if Peralta had known that his 1999 order was erroneously obtained, Peralta had no right to enter the United States in 2012, so securing counsel in 2012 would not have aided him.[12] Cf. Maness v. Meyers, 419 U.S. 449, 458, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) (explaining that persons who “refuse to obey [a court] order generally risk criminal contempt even if the order is ultimately ruled incorrect”). If Peralta thought that his 1999 removal order was illegal, his remedy was not to sneak back across the border, but to seek to reopen the removal order from outside the United States. See Coyt v. Holder, 593 F.3d 902, 907 (9th Cir. 2010) (“[PJhysical removal of a petitioner by the United States does not preclude the petitioner from pursuing a motion to reopen [immigration proceedings].”).[13] In a similar context, we determined that reinstatement of a previous removal order did not violate *1138 due process where the alien was not entitled to have the validity of the reinstated order reviewed by an immigration judge:
While aliens have a right to fair procedures, they have no constitutional right to force the government to re-adjudicate a final removal order by unlawfully reentering the country.... If [an alien] has a legitimate basis for challenging his prior removal order, he will be able to pursue it after he leaves the country, just like every other alien in his position.
Morales-Izquierdo v. Gonzales, 486 F.3d 484, 498 (9th Cir. 2007).
We conclude that the risk of wrongful removal under § 1225 is quite low, and that providing additional safeguards in the form of counsel would not significantly improve the existing process, particularly when weighed against the cost, which we discuss below.
c. Government’s interest
Peralta argues that, “[g]iven that the Government is not being asked to foot the bill, its vehement opposition to a right to counsel in expedited removal is baffling, as well as unreasonable.” We think Peralta underestimates the burden a right to counsel would place on the government in this context. Although the government would not have to pay an alien’s attorney’s fees, Peralta has not taken into account the costs to the government that would result from the inevitable delay if an alien is entitled to seek counsel. The government would have to detain the alien perhaps for days or weeks longer, while the alien is given “reasonable” time to seek representation, as we have required in cases in which there is a statutory right to counsel in removal proceedings, and which we would presumably require here. See Biwot, 403 F.3d at 1098-99 (citing Rios-Berrios v. INS, 776 F.2d 859, 862-63 (9th Cir. 1985)). If the alien is entitled to counsel, the government will, in turn, want to provide its own counsel — as it does in removal proceedings under §§ 1228 and 1229a. “[Lawyers, by training and disposition, are advocates and bound by professional duty to present all available evidence and arguments in support of their clients’ positions and to contest with vigor all adverse evidence and views.” Walters, 473 U.S. at 324, 105 S.Ct. 3180 (quoting Gagnon v. Scarpelli, 411 U.S. 778, 787-88, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)). The presence of lawyers will inevitably complicate the proceedings. As Judge Friendly put it, ‘Within the limits of professional propriety, causing delay and sowing confusion not only are [a lawyer’s] right but may be his duty.” Henry J. Friendly, Some Kind of Hearing, 123 U. Pa. L. Rev. 1267, 1288 (1975).
The expedited removal process is intended to allow the government to exclude quickly those aliens found at or near the border who are clearly inadmissible— those who have no legal entry documents and who have established only a limited presence here. The introduction of lawyers in the expedited removal process is likely to turn the proceeding into something more akin to a trial — and a trial not before an IJ, but before an immigration officer unqualified to weigh the competing demands of opposing counsel in what will become an adversary proceeding. This will prolong the decisionmaking process, exponentially increasing the cost to the government as the government must detain the alien, pay for the government’s own representation, pay for the creation of a longer record, and pay for the increased time the immigration officer must spend adjudicating such cases, distracting the officer from any other duties. Such a process, as Judge Friendly recognized in a slightly different context, is “not formulated for a situation in which many thousands of hearings must be provided each month.” Id. at 1290.
*1139 In short, the introduction of counsel risks destroying the “expedited” removal process.[14] It is in no way “baffling” that the government so vehemently objects to this. We are also deeply concerned with the “new and wholly unwarranted incentive” this is likely to create “for aliens who have previously been removed to reenter the country illegally in order to take advantage of this self-help remedy. It would also make a mockery of aliens who do respect our laws and wait patiently outside our borders seeking lawful admission.” Morales-Izquierdo, 486 F.3d at 498.
[[Image here]]
In light of the limited benefit a right to counsel is likely to provide in this context, and in light of the significant cost the government would likely incur, we refuse to sanction this kind of self-help, and the wholesale circumvention of our immigration laws, by finding that aliens who illegally enter the United States and are subject to expedited removal proceedings under § 1225 are constitutionally entitled to counsel. “Nothing in the Constitution requires such a perverse result.” Morales-Izquierdo, 486 F.3d at 498.
In sum, Peralta suffered no due process violation when he was denied counsel in his expedited removal hearing. His interests in securing counsel are limited, the government’s interest in having expedited proceedings is high, and we find there is relatively little risk of error in such proceedings.
B. Right to Be Informed of Withdrawal
Peralta also argues that he was denied due process because he was not informed of the possibility of withdrawal relief under § 1225(a)(4). That section states: “An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw his application for admission and depart immediately from the United States.” 8 U.S.C. § 1225(a)(4). “In the context of removal proceedings for aliens who have already been admitted into the United States, we have held that due process requires the immigration judge to inform such aliens of potentially available avenues of relief.” Sanchez-Aguilar, 719 F.3d at 1112 (citing United States v. Arce-Hernandez, 163 F.3d 559, 563 (9th Cir. 1998)); see also Barajas-Alvarado, 655 F.3d at 1084 (“[T]he Supreme Court has ruled that when Congress enacts a procedure, aliens are entitled to it.”). By contrast, “[n]on-admitted aliens ... who seek entry at the border ‘are entitled only to whatever process Congress provides.’ ” Sanchez-Aguilar, 719 F.3d at 1112 (quoting Barajas-Alvarado, 655 F.3d at 1088). Neither § 1225, nor the corresponding regulations governing expedited removal, require an immigration officer to advise an alien of the opportunity to request withdrawal relief, and we have held that “[a]s a result, the immigration officer’s failure to inform [an alien] of his ability to request withdrawal of his application for admission [does] not violate his due process rights.” Id.
*1140 Sanchez-Aguilar dealt with an alien who was detained at a port-of-entry, not one in Peralta’s position who crossed the border elsewhere and managed to effect brief entry into the United States before he was caught by Border Patrol. Thus, the same confusion we noted above, about the extent to which an alien in Peralta’s position — one who has effected technical entry into the United States, but who has not been admitted — is entitled to due process, applies here. We need not answer the due process question in this case, however. Even assuming that Peralta had a due process right to notice of the possibility of withdrawal relief, Peralta cannot demonstrate prejudice.
In order to establish that he was prejudiced by the government’s failure to notify him of withdrawal relief, Peralta must “make a ‘plausible’ showing that the facts presented would cause the Attorney General to exercise discretion in his favor.” Barajas-Alvarado, 655 F.3d at 1089 (quoting Arce-Hernandez, 163 F.3d at 563). “Plausibility” requires more than a mere showing of possibility, however. The Customs and Border Patrol has created an Inspector’s Field Manual which lays out six factors that should be used to guide the granting of the Attorney General’s withdrawal relief. These factors are: (1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) the ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations. Customs & Border Patrol, Inspector’s Field Manual § 17.2 (2006); see also Barajas-Alvarado, 655 F.3d at 1090.
As to the first factor, the seriousness of the immigration violation, Peralta argues that his violation was not “serious” because he did not present fraudulent documents to attempt to gain entry to the United States. The use of fraudulent documents, however, appears to operate as an automatic disqualifier; this does not mean that the non-use of fraudulent documents renders repeated immigration violations non-serious. See Inspector’s Field Manual § 17.2(a); see also United States v. Garcia-Gonzalez, 791 F.3d 1175, 1179 (9th Cir. 2015); Barajas-Alvarado, 655 F.3d at 1091. Indeed, we find Peralta’s consistent inability to abide by our immigration laws, despite several periods of imprisonment as a result of these violations, to be serious, and to demonstrate a clear intent to violate the law. We are not sympathetic to Peral-ta’s argument that he violated the law merely to “remedy the unlawful deportation that the Government had perpetrated on him years before.” There is no evidence that Peralta entered the United States in order to correct any errors in his prior immigration proceedings; he had other, lawful avenues available to him that did not involve further violations of our immigration laws. Thus, the first and third factors clearly weigh against him. See Raya-Vaca, 771 F.3d at 1208 (finding that “a history of illegal reentries” made the defendant’s most recent violation “relatively serious”); Barajas-Alvarado, 655 F.3d at 1090 (finding that the fact the defendant was subject to two previous expedited removal rendered the most recent violation “serious”).
We find as well that the second and fourth factors, related to inadmissibility, similarly weigh against Peralta. He argues that his only prior finding of inadmissibility was the 1999 removal order, based on case law at the time that has now changed, and that his U.S. citizen children could have sought adjustment of status on his behalf in 2012. First, we note that his 1999 removal order was reinstated three times, which means that he had four findings of inadmissibility. We have stated before *1141 that, even where a prior finding of inadmissibility may years later be rendered incorrect by a change in the law, this does not affect its finality for immigration purposes. See Raya-Vaca, 771 F.3d at 1208 (noting that the defendant’s prior finding of inadmissibility “cut against” his claim that withdrawal relief was plausible, even if it had “due process concerns”' in light of subsequent changes in the law); Aguilera-Rios, 769 F.3d at 633 n.3 (“[A] determination by this Court on collateral review that a noncitizen’s conviction was not for a federal aggravated felony offense would not affect the finality of the prior removal.” (citing 8 C.F.R. § 1003.23(b)(1))).
Second, we note that Peralta could not have sought adjustment of status, and was therefore unlikely to overcome the previous findings of inadmissibility.[15] Adjustment of status is available only to aliens who are “inspected and admitted or paroled into the United States,” 8 U.S.C. § 1255(a), which Peralta had not been. An alien must also be admissible at the time he seeks adjustment of status, see id., and Peralta was inadmissible at the time for at least two reasons: he had no valid entry documents, see id. § 1182(a)(7), and he had been convicted for felony possession of a controlled substance, see id. § 1182(a)(2)(A)(i)(II); see also, e.g., Garcia-Gonzalez, 791 F.3d at 1179 (finding that the fourth factor weighed against an alien and noting that the defendant’s state-law conviction for possession of cocaine rendered him inadmissible and therefore ineligible for adjustment of status). Thus, the second and fourth factors weigh against Peralta.
As to the fifth factor, age and poor health, Peralta was fifty-three years old at the time of his expedited removal in 2012. Despite now claiming that he “suffered many years of back-breaking labor in the fields,” and that this somehow tilts the fifth factor in his favor, Peralta told the Border Patrol agent who took him into custody in 2012 that he was, in fact, in good health. He also told the agent that'he was planning to travel to Los Angeles to seek work. Indeed, Peralta was certainly well enough to walk through the desert to enter the United States, and to hide in the brush to evade Border Patrol. In short, there is nothing in the record to suggest that Peralta was in ill health at the time of his expedited removal. This factor weighs against him as well.
Finally, we address factor six, humanitarian considerations. On this point, Peral-ta principally emphasizes his long residence in the United States prior to his 1999 removal and the fact that he has three U.S. citizen children. However, in Barajas-Alvarado, we concluded that an alien’s “ties to the United States” are “not listed as considerations in the Inspector’s Field Manual and therefore carry little weight.” 655 F.3d at 1091. From the record, Peralta’s family ties are also somewhat unclear. In his most recent arrest, in 2014, Peralta claimed that he was attempting to travel to Fresno to see his family, but in 2012, he told Border Patrol that he wanted to travel to Los Angeles to work, making no mention of his family. Beyond the fact of its existence, there is little mention of Peralta’s family .or his involvement with it in the record, and as we noted above, there is nothing to indicate that Peralta’s children had or have attempted to file an application for adjustment of status on his behalf. Hence, these facts do *1142 not appear to weigh in Peralta’s favor. Even assuming that this factor did weigh in Peralta’s favor, this would not be enough to outweigh every other factor against him.
Because the majority of the Inspector’s Field Manual factors weigh against withdrawal relief, Peralta cannot show that it was “plausible” that he would have been granted this relief. Accordingly, he cannot show that he was prejudiced by the immigration officer’s failure to notify him of the possibility of withdrawal.
IV. CONCLUSION
In sum, we conclude that Peralta’s 2012 expedited removal was not fundamentally unfair. Peralta had no Fifth Amendment due process right to counsel in the expedited removal proceeding under § 1225, and he cannot demonstrate prejudice resulting from the failure to notify him of the right to withdraw his application for admission. As a result, his 2012 expedited removal could be used as a predicate for his § 1326 conviction. We therefore affirm the district court’s denial of Peralta’s motion to dismiss the indictment and his subsequent judgment and sentence, as well as the revocation of his supervised release.
AFFIRMED.

. When we refer to the "right to counsel” in this case, we mean the right of an alien to hire counsel at no expense to the government. We do not refer to a right to government-appointed counsel.

. This incident is not to be confused with the March 2014 incident, which is the subject of this case and which follows a very similar pattern.

. In sum, from what we can tell from the record, Peralta has at least eight felony arrests (1982, 1983, 1990, 1996, 2000, 2002 (2), and 2014) and five misdemeanor DUI convictions, and he has been removed from the United States at least four times (1999, 2001, 2004, and 2012).

. At the time, the Board of Immigration Appeals (BIA) considered felony DUI a "crime of violence” requiring an alien’s removal under 8 U.S.C. § 1101(a)(43)(F). Felony DUI is no longer considered an aggravated felony crime of violence. See Leocal v. Ashcroft, 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004); United States v. Trinidad-Aquino, 259 F.3d 1140 (9th Cir. 2001).

. Expedited removal proceedings under § 1225 are not to be confused with expedited removal proceedings under § 1228, which deals with the removal of aggravated felons.

. Section 1225 provides that the discretion rests with the Attorney General. The Homeland Security Act of 2002 designated the Secretary of Homeland Security in place of the Attorney General. 6 U.S.C. §§ 251(2), 252(a)(3), 271(b), 552(d), 557; see Clark v. Martinez, 543 U.S. 371, 374 n.1, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS now reside with the Secretary of Homeland Security).

. We note first that, because § 1225(b) provides for no administrative or judicial review of an expedited removal order, Peralta had no administrative remedies to exhaust and has been deprived of judicial review. The government concedes that Peralta therefore satisfies the first two requirements for challenging his § 1326 conviction. See Raya-Vaca, 771 F.3d at 1202. We therefore need address only the “fundamentally unfair” prong, i.e., whether Peralta suffered a due process violation and was prejudiced as a result.

. In contrast, aliens who attempt to enter at an official port-of-entry and are detained by immigration officials have not “entered” the United States, even if they may be physically present in U.S. territory, because they have not crossed the border "free from official restraint.” This is sometimes referred to as the "entry fiction.” United States v. Argueta-Rosales, 819 F.3d 1149, 1162-68 (9th Cir. 2016) (Bybee, J., dissenting) (discussing the history of the official restraint doctrine); see also Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 213-15, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (referring to this “legal fiction”); United States v. Parga-Rosas, 238 F.3d 1209, 1213 (9th Cir. 2001).

. In Barajas-Alvarado, we concluded that Ba-rajas-Alvarado’s "claim that he was denied his right to counsel is meritless on its face.” 655 F.3d at 1088. The defendant in that case, though, never entered the United States. Id. Here, Peralta’s argument depends on the distinction between aliens who have not entered the United States ánd are entitled only to whatever process Congress has chosen to provide, see United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950), and aliens who have entered the United States and therefore may be entitled to something more.

. The dissent claims that the fact that Peral-ta had moved to the United States in 1979 shows that expedited removal proceedings *1136 target more than just people with no or a limited residence in the United States. Dissent at 1143-44. But this overlooks the fact that Peralta was first removed from the United States in 2000 and has not legally resided here since then. And in his initial removal proceedings, Peralta was afforded the full ambit of due process protections that he desires here. With this in mind, any ties that Peralta has to the United States have already been taken into account and severed.

. The dissent, nonetheless, went beyond the record and found a study indicating that protection for those who seek asylum or claim fear of persecution are sometimes erroneously denied. Dissent at 1144-45, 1145 n.16. These risks were not raised by any party below, were not briefed, and were not mentioned at oral argument. We are unwilling to credit a twelve-year-old study without the benefits of our adversarial system to challenge its validity, methodology, or significance to the case at hand.
The dissent also raises the possibility that some individuals may be incompetent due to mental illness or disability. Dissent at 1145. This point too was not raised below, was not briefed, and was not mentioned at oral argument. Even taking these highly particularized risks into account, and ignoring their procedural and substantive flaws, would not tip the Mathews factors in Peralta’s favor. See Walters, 473 U.S. at 321, 105 S.Ct. 3180 (”[P]ro-' cedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.” (quoting Mathews, 424 U.S. at 344, 96 S.Ct. 893)).

. Peralta’s 1999 removal order followed issuance of a notice to appear and a hearing before an immigration judge. The IJ advised Peralta that he could secure counsel at his own expense and continued the case so Peral-ta could do so. Peralta did not obtain counsel.

. We note that Peralta has given no explanation as to why, in the thirteen years between his initial 1999 removal and his 2012 expedited removal, he never sought the assistance of counsel, which he now so earnestly claims could have made a difference in his immigration status. Instead, Peralta chose to reenter the United States illegally, not once, but six different times.

. The dissent, in a one-paragraph dismissal of the government's interest, claims that the cost of providing an attorney "does not appear to be prohibitive” because the government allows representation in other types of expedited removal proceedings. Dissent at 1146 (citing 8 U.S.C. § 1228(b)(4)(B)). But the government’s allowance of representation in dissimilar proceedings does not mean that the costs of representation in those proceedings, let alone in the proceedings before us, are not significant. It just means that the government has chosen to bear those costs for people in that situation. We have no basis for imposing real costs on the government simply because Congress has made the choice to assume such costs in other situations.

. Despite Peralta’s claim that he could have applied for adjustment of status based on his relationship to his adult U.S. citizen children, we note that no application for adjustment of status was pending on Peralta’s behalf at the time, nor, to our, knowledge, has one ever been filed on Peralta's behalf by any qualifying relative since his original removal in 1999.